# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54142-4-II |
| Respondent, | |
| v. | |
| EDDIE LAMONT HOGAN, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Eddie L. Hogan appeals his convictions and sentence for first degree felony murder, two counts of first degree robbery, first degree kidnapping, two counts of first degree burglary, second degree assault, and first degree unlawful possession of a firearm. Hogan argues that the trial court erred by admitting his confession, the evidence was insufficient to prove he committed the second count of first degree burglary, and the trial court erred by failing to recognize its discretion to run firearm sentencing enhancements concurrently. Hogan also claims in a statement of additional grounds (SAG)[1] that he received ineffective assistance of counsel and that the trial court erred by sentencing him using the wrong offender score.

We hold that the trial court did not err by admitting Hogan's confession, the evidence was sufficient to prove Hogan committed the second count of first degree burglary, and the trial court did not err by finding it had no discretion to run firearm sentence enhancements concurrently. With regard to Hogan's SAG, we decline to address Hogan's ineffective assistance of counsel

---

[1] RAP 10.10.

claim and hold that the trial court sentenced Hogan with the correct offender score. Accordingly, we affirm Hogan's convictions and sentence.

FACTS

Over the course of two nights, Hogan committed crimes against three victims: William Fultz, Justine Ruddell, and Robert Crall. On March 13, 2018, Hogan robbed Fultz at a convenience store and forced Fultz to walk with him to a nearby house, where Hogan hit Fultz with a firearm and kicked him. Later that night, Hogan burglarized Ruddell's home and pointed a gun at her. A few hours later, Hogan returned to Ruddell's home and fired several shots in her house. Approximately one day later, Hogan hailed a taxi, fought with the taxi driver, Crall, and shot him in the chest. Hogan was 19 years old at the time he committed these crimes.

The State charged Hogan with first degree felony murder, second degree felony murder, first degree robbery, first degree kidnapping, two counts of first degree burglary, two counts of second degree assault, and first degree unlawful possession of a firearm. All of the charges, except for first degree unlawful possession of a firearm, had firearm sentencing enhancements.

A.    CrR 3.5 HEARING

Before trial, the State sought to admit Hogan's statements made in the interview with police. Hogan objected, arguing that the voluntariness of his *Miranda*[2] waiver was affected by stomach pain and blood on his face.

At the beginning of the interview with police, Hogan appeared to have stomach pains and was bent in half. Additionally, he had blood on his face from an abrasion he sustained during his

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

arrest. During the interview, officers read Hogan his *Miranda* rights, and he signed and waived them. One of the interviewing officers testified that he had no concerns about Hogan's mental acuity or ability to participate in the interview. The trial court also viewed a video of Hogan's interview with police.

At the CrR 3.5 hearing, the trial court rejected Hogan's attempt to have his statements suppressed, finding that while Hogan appeared to have a stomach ache for the first ten minutes of the interview, he was not in as much physical discomfort at the middle and end of the interview. The trial court noted that Hogan did not request to stop answering questions due to his discomfort. Additionally, the trial court stated that Hogan "certainly understood the questions" and "gave vocal answers to the questions." 2 Verbatim Report of Proceedings (VRP) (Oct. 29, 2019) at 77. The trial court found that "[t]here was no behavior on the part of the officers that indicated that they were doing any arm-twisting" and the officers gave Hogan plenty of time to answer questions. 2 VRP (Oct. 29, 2019) at 77.

The trial court issued its findings of fact and conclusions of law, which included the two following findings.

> The abrasions to the defendant's face did result in mild bleeding and would have likely resulted in mild discomfort. However, those abrasions did not require medical aid and the defendant never asked for medical aid or it would have been provided. The defendant suffered no other injuries and the abrasions would not have impacted his mental thought processing.

Clerk's Papers (CP) at 106.

> Towards the outset of the interview, the defendant complained that he was suffering from stomach pain. He also mentioned that when Officer Joseph had initially contacted him, he had been headed home to retrieve some stomach medication. The defendant's stomach issues apparently subsided early in the interview as he did not bring it up further and he did not otherwise appear to be in

3

significant discomfort. The defendant's stomach issues did not impair the defendant's mental thought processing and would not have otherwise played a significant role in his decisions regarding whether to waive his *Miranda* rights and interview with the detectives.

CP at 107.

The trial court's conclusion of law stated that Hogan "knowingly, voluntarily, and intelligently waived his *Miranda* rights in deciding to interview with the detectives" and that Hogan's statements were admissible. CP at 108.

A video of the interview was ultimately admitted at trial as Exhibit 42A. During the interview, Hogan confessed that he was involved in the incident with Crall but denied involvement in the Ruddell and Fultz incidents.

B.    TRIAL

As relevant to this appeal, witnesses testified at trial to the following facts.

1.    Incident Involving William Fultz

On the night of March 13, 2018, Fultz approached Hogan in a convenience store parking lot and had a conversation with Hogan. Hogan then asked Fultz if he had any change to spare, and Fultz told Hogan he did not. Hogan then pulled a handkerchief over his nose, pulled his hood up, and pointed a revolver at Fultz's head. Hogan told Fultz to give him his wallet. Fultz gave Hogan his phone and the change in his pocket.

In an attempt to make Hogan put the gun away, Fultz offered to take Hogan to his home to give him more money, beer, and marijuana, and Hogan agreed. Hogan pushed Fultz from the back, and they walked together to a nearby house where Fultz hoped to get help. When a woman inside the house opened the blinds and saw the two men outside, Hogan hit Fultz in the back of

his head with the revolver. Fultz fell to the ground, and Hogan struck Fultz in the chest with the gun and kicked him.

Fultz and Hogan both ran away separately. Fultz went back to the convenience store, had the clerk call the police, and spoke with police when they showed up. At trial, Fultz identified Hogan as the person who robbed him.

2.      Incidences Involving Justine Ruddell

A few hours later, in the very early morning of March 14, 2018, Ruddell unexpectedly awoke to find Hogan in her house. Ruddell chased Hogan onto her back porch, where he pulled a revolver on her and told her to get down.

Hogan was wearing a mask that came up to his nose. Hogan did not have anything on his head, and Ruddell saw that he had dark hair and tan skin. Hogan then went around the side of Ruddell's house and left. During this incident, Hogan took a backpack, jewelry, and a camera from Ruddell's house.

Ruddell called 911, and police officers showed up approximately 30 minutes later. Police found Fultz's cell phone in Ruddell's yard. Ruddell also called her sister, who came to Ruddell's house.

A few hours later, Ruddell went onto her back porch and saw Hogan standing by a tree, where he slowly raised his gun. Hogan was still wearing the mask. Ruddell had no question in her mind that it was the same man from the first incident. Ruddell saw Hogan coming "into the entrance of [her] house." 5 VRP (Nov. 4, 2019) at 269. Ruddell screamed and ran into the house, where she hid behind the dining room table with her sister while Hogan shot at them.

Photographs showed two bullet holes in Ruddell's wall. Ruddell stated that there was no way for the bullet holes to end up in that part of the wall if Hogan had shot from outside the house. The Washington State Patrol Crime Lab determined that the bullets in the wall of Ruddell's house came from Hogan's gun.

### 3. Incident Involving Robert Crall

Approximately one day after the Ruddell incidents, just after 5:00 a.m. on March 15, 2018, Hogan flagged down and got into Crall's taxi. An eyewitness drove by and saw Hogan and Crall fighting over a bag in the front seat of the taxi. There was a gunshot, and Crall stumbled and collapsed onto the ground. At this point, Crall was not moving or breathing. When emergency responders arrived, they saw that Crall had a gunshot injury in his chest. Crall died at the scene.

Surveillance video from nearby businesses showed Hogan entering the cab and the cab leaving a parking lot. Another surveillance video showed the cab stopping in the street and provided audio documentation of the gunshot approximately one minute later. Cameras inside the taxi took photos of Hogan's face, though at one point he covered his face with a bandana.

Local news media showed videos and photos of Hogan in the taxi's backseat. Fultz and Ruddell both saw these videos and photos and identified the person in the images as the man who robbed them.

## C. VERDICT AND SENTENCING

The jury found Hogan guilty of first degree felony murder, second degree felony murder, two counts of first degree robbery, first degree kidnapping, two counts of first degree burglary, second degree assault, and first degree unlawful possession of a firearm. The jury returned

affirmative special verdicts for the firearm sentencing enhancements associated with all the convictions except for the first degree unlawful possession of a firearm conviction.

At sentencing, the trial court ruled that the robbery and kidnapping convictions for the incident with Fultz constituted the same criminal conduct. The trial court also ruled that the burglary and assault convictions for the second incident with Ruddell constituted the same criminal conduct. Because Hogan was convicted of first degree felony murder for killing Crall, the trial court dismissed the jury's finding of guilt for the second degree felony murder charge on double jeopardy grounds.

Hogan argued that the trial court had discretion to run the firearm sentencing enhancements concurrently as an exceptional sentence downward based on his youth. The State argued that the trial court did not have the discretion to run the firearm sentencing enhancements concurrently. The trial court ruled that it did not have the ability to impose the firearm sentencing enhancements concurrently. The trial court imposed the firearm sentencing enhancements consecutively.

The trial court also imposed an exceptional sentence below the standard range for the first degree felony murder conviction, finding that "the defendant's capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law, was significantly impaired." CP at 298. The trial court sentenced Hogan based on an offender score that included Hogan's current adult convictions.

Hogan appeals.

ANALYSIS

A.   ADMISSION OF HOGAN'S CONFESSION

Hogan argues that the trial court erred by admitting his confession.  Specifically, Hogan argues that he did not voluntarily waive his *Miranda* rights because he was in poor physical condition and that the trial court should have considered his age as a factor impacting the voluntariness of his waiver.  We disagree.

1.   Waiver Of *Miranda* Warnings

"The State bears the burden of showing a knowing, voluntary, and intelligent waiver of *Miranda* rights by a preponderance of the evidence."  *State v. Athan*, 160 Wn.2d 354, 380, 158 P.3d 27 (2007).  We will not disturb a trial court's conclusion that a defendant voluntarily waived their *Miranda* rights "if the trial court found, by a preponderance of the evidence, that the statements were voluntary and substantial evidence in the record supports the finding."  *Id.* Substantial evidence is that which is "'sufficient to persuade a fair-minded, rational, person of the truth of the finding.'"  *State v. Scherf*, 192 Wn.2d 350, 370, 429 P.3d 776 (2018) (quoting *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006)).  In considering whether a defendant voluntarily waived his *Miranda* rights, courts consider the totality of the circumstances.  *State v. Mayer*, 184 Wn.2d 548, 556, 362 P.3d 745 (2015).

A defendant can voluntarily waive his *Miranda* rights even while in physical discomfort or pain.  *See State v. Butler*, 165 Wn. App. 820, 828, 269 P.3d 315 (2012); *see also State v. Riley*, 19 Wn. App. 289, 296, 576 P.2d 1311 (voluntary waiver where defendant had not slept for 48 hours and was only partially clothed), *review denied*, 90 Wn.2d 1013 (1978).  In *Butler*, the court considered whether the defendant's statements to police were voluntary when the defendant was

in the intensive care unit, required to lay flat in a bed, and on pain medication. 165 Wn. App. at 825. The court held that a defendant can "'voluntarily waive his *Miranda* rights even when he is in the hospital, on medication, and in pain.'" *Id.* at 828 (quoting *U. S. v. George*, 987 F.2d 1428, 1430 (9th Cir. 1993)). The *Butler* court noted that the defendant answered police questions appropriately, and there was no showing that police took advantage of the defendant's weakened condition. *Id.* For these reasons, the court held that the defendant's statements were voluntary. *Id.*

Hogan argues that the trial court should have considered his age as a factor impacting the voluntariness of his waiver. But Hogan provides no legal authority mandating that courts issue specific findings regarding the effect of an adult defendant's age on the voluntariness of their waiver. Where no authorities are cited in support of a proposition, we may assume that counsel, after diligent search, has found none. *State v. Arredondo*, 188 Wn.2d 244, 262, 394 P.3d 348 (2017). In any event, substantial evidence supports a finding that Hogan's age did not affect the voluntariness of his waiver, as Hogan was 19 years old, appeared to understand and answer questions coherently, and did not express any confusion regarding his *Miranda* rights.

Hogan also argues that he did not voluntarily waive his *Miranda* rights because he was in poor physical condition. Here, at the CrR 3.5 hearing, one of the interviewing officers testified that he had no concerns about Hogan's mental acuity or ability to participate in the interview. The trial court also viewed a video of Hogan's interview with police. The video showed that, at the beginning of the interview with police, Hogan appeared to have stomach pains and was bent in half. However, when the officers read Hogan his *Miranda* rights, he appeared to understand the rights, then signed and waived them without hesitation. The video also showed that Hogan

appeared to understand the officers' questions, responded appropriately, and did not give any indication that pain or physical discomfort was inhibiting his ability to think or provide answers to officers. The officers asked questions calmly, used an appropriate tone, and gave Hogan plenty of time to answer their questions.

Here, like in *Butler*, a rational, fair-minded person would be persuaded that a preponderance of the evidence showed that, based on the totality of the circumstances, Hogan voluntarily waived his Miranda rights because Hogan answered questions appropriately and police did not appear to take advantage of Hogan's condition. 165 Wn. App. at 828. Therefore, the trial court did not err in finding that Hogan voluntarily waived his right to remain silent and admitting Hogan's confession.

2.      Harmless Error

Even if the trial court erred by admitting Hogan's confession, that error was harmless. A challenge to a confession's admissibility is subject to a constitutional harmless error analysis. *See State v. Rhoden*, 189 Wn. App. 193, 202, 356 P.3d 242 (2015). "'A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error.'" *Id.* at 202-03 (quoting *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986)). The State bears the burden of proving an error in admitting a confession harmless beyond a reasonable doubt. *Id.* at 203.

Here, during the interview, Hogan confessed that he was involved the incident with Crall but denied involvement in the Ruddell and Fultz incidents. At trial, the State elicited testimony from an eyewitness who saw Hogan and Crall fighting in the front seat of the taxi, then heard a

gunshot and saw Crall collapse onto the ground. The State also introduced video footage of Hogan getting into the taxi. Additionally, the State produced video footage of the taxi stopping, followed shortly by the audible sound of the gunshot. Finally, the State produced photos of Hogan in the taxi in the minutes surrounding Crall's death, some of these photos with Hogan's face uncovered. When these images were publicized by the media, both Fultz and Ruddell identified the person in the photos as the man who robbed them. At trial, Fultz again identified Hogan as the person who robbed him.

Based on these multiple sources of evidence corroborating the timeline of the shooting and identifying Hogan as the person involved in the shooting, any reasonable jury would have found beyond a reasonable doubt that Hogan killed Crall, even without Hogan's confession. Therefore, even if the trial court erred by admitting Hogan's confession, the error was harmless.[3]

B.    SUFFICIENCY OF EVIDENCE FOR FIRST DEGREE BURGLARY

Hogan argues that there is insufficient evidence to support his first degree burglary conviction based on the incident involving Ruddell where he entered her home and shot at her. We disagree.

---

[3] Hogan argues that his confession negates Mr. Hogan's defense that he shot Mr. Crall after becoming afraid that Mr. Crall was reaching for something. The record shows that Hogan did not raise this defense at trial except for a passing reference in closing argument. The jury would not have known about this purported defense at all except for the admission of statements from Hogan's interview, where he said that he saw Crall reaching. The admission of Hogan's confession cannot prejudice a defense that was not raised.

    1.       Legal Principles

        a.       Standard of review

We review challenges to the sufficiency of the evidence by considering whether any rational trier of fact, in viewing the evidence in the light most favorable to the State, could find the essential elements of the crime beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). An insufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). We defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *State v. Ague-Masters*, 138 Wn. App. 86, 102, 156 P.3d 265 (2007).

        b.       First degree burglary

RCW 9A.52.020(1) provides that

> [a] person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

Thus, first degree burglary requires, as an element to the offense, that the defendant enter or remain unlawfully in a building. RCW 9A.52.020(1).

Hogan argues that the evidence was "insufficient to establish that he entered Ms. Ruddell's home" a second time, when the shooting occurred, because Ruddell was unable to identify him as

the person who entered her home. Br. of Appellant at 24. Hogan does not contest the unlawfulness of any such entry.

2.  Analysis

The evidence shows that Ruddell first encountered Hogan when she woke to find him in her house. Ruddell saw Hogan clearly during this first incident and later identified Hogan in the taxi footage as the person who robbed her. Although Hogan was wearing a mask that came up to his nose, Hogan did not have anything on his head, and Ruddell saw that he had dark hair and tan skin. Additionally, police found Fultz's cell phone in Ruddell's yard after this first incident. At trial, Fultz identified Hogan as the person who robbed him and took his cell phone. Viewing this evidence in the light most favorable to the State, a rational factfinder could conclude beyond a reasonable doubt that Hogan was the person Ruddell saw during the first incident at her home.

The evidence also shows that Hogan was responsible for the second incident at Ruddell's home. The Washington State Patrol Crime Lab determined that the bullets in the wall of Ruddell's house came from Hogan's gun. Ruddell also testified that there was no question in her mind that the intruder in the second incident at her home was the same masked man from the first incident. Afterward, when images of Hogan in the taxi were posted by local media outlets, Ruddell identified Hogan as the person responsible for shooting at her. Viewing this evidence in the light most favorable to the State, a rational factfinder could conclude beyond a reasonable doubt that Hogan returned to Ruddell's home after robbing her earlier in the evening.

The evidence further shows that Hogan entered Ruddell's home. Ruddell saw Hogan coming "into the entrance of [her] house." 5 VRP (Nov. 4, 2019) at 269. The shooting left two bullet holes in Ruddell's wall, and Ruddell stated that there was no way for the bullet holes to end

up in that part of the wall if Hogan had shot from outside the house. Viewing this evidence in the light most favorable to the State, a rational factfinder could find beyond a reasonable doubt that Hogan was inside of Ruddell's home at the time he fired shots into her room wall.

In sum, viewing all the evidence above in the light most favorable to the State, a rational factfinder could find beyond a reasonable doubt that Hogan entered Ms. Ruddell's home during the second incident. Hogan does not contest the unlawfulness of any such entry, nor does he challenge any other element of his first degree burglary conviction. Therefore, the evidence was sufficient to support Hogan's second conviction for first degree burglary.

C.    FIREARM SENTENCING ENHANCEMENTS

Hogan argues that the trial court erred by stating it did not have the discretion to run firearm sentencing enhancements concurrently. Specifically, Hogan contends that the trial court could have modified the firearm sentencing enhancements based on his youthfulness as a mitigating factor. We disagree.

All defendants are entitled to ask sentencing courts for exceptional sentences and have the alternative actually considered. *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). A trial court errs when it operates under the "'mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which [a defendant] may have been eligible.'" *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017) (quoting *In re Pers. Restraint of Mulholland*, 161 Wn.2d 322, 333, 166 P.3d 677 (2007)).

However, firearm sentencing enhancements are mandatory and must be imposed consecutively, regardless of whether an offender receives an exceptional sentence below the standard range on the underlying offense. *State v. Brown*, 139 Wn.2d 20, 28-29, 983 P.2d 608

14

(1999), *overruled in part by State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017). In *Houston-Sconiers*, our Supreme Court overruled *Brown* as it applies to juvenile offenders who were tried and sentenced in adult court. *Houston-Sconiers*, 188 Wn.2d at 18-22. Specifically, our Supreme Court held that sentencing courts have discretion to "consider mitigating circumstances associated with the youth of any *juvenile defendant*," and "[t]o the extent our state statutes have been interpreted to bar such discretion *with regard to juveniles*, they are overruled." *Id.* (emphasis added).

Because *Houston-Sconiers* overruled *Brown* only "with regard to juveniles," *Brown* is still binding authority for adult offenders. *Houston-Sconiers*, 188 Wn.2d at 21; *see also State v. Brown*, 13 Wn. App. 2d 288, 291, 466 P.3d 244 (holding that court does not have the authority to overrule *Brown* as it applies to adult offenders), *review denied*, 196 Wn.2d 1013 (2020); *State v. Mandefero*, 14 Wn. App. 2d 825, 831-32, 473 P.3d 1239 (2020) (holding that *Houston-Sconiers* does not apply to youthful offenders who were over 18 at the time of their offense, sentencing enhancements are mandatory under *Brown*, and the appellate court does not have the authority to overrule *Brown*).

Here, the jury returned special verdicts finding that the firearm sentencing enhancements applied to all convictions except for the first degree unlawful possession of a firearm conviction. Hogan argued that the trial court had discretion to run the firearm sentencing enhancements concurrently as an exceptional sentence downward based on his youth. The trial court declined, stating that it did not have the ability to impose the firearm sentencing enhancements concurrently. Because *Brown* continues to apply to adult offenders, firearm sentencing enhancements must be imposed consecutively for adult offenders, including 19-year-old Hogan. *See Houston-Sconiers*, 188 Wn.2d at 21; *Brown*, 139 Wn.2d at 28-29. Therefore, the trial court properly stated that it did

not have the discretion to impose Hogan's firearm sentence enhancements concurrently.[4] *See Houston-Sconiers*, 188 Wn.2d at 21; *Brown*, 139 Wn.2d at 28-29. The trial court did not err.

D.      SAG

        1.      Ineffective Assistance Of Counsel

Hogan claims that his trial counsel provided ineffective assistance of counsel. We do not consider this claim.

In a SAG, "[r]eference to the record and citation to authorities are not necessary or required, but the appellate court will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). "[T]he appellate court is not obligated to search the record in support of claims made in a defendant's statement of additional grounds for review. Only documents that are contained in the record on review should be attached or referred to in the statement." RAP 10.10(c).

Also, we will not consider matters outside the record on direct appeal. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Thus, "[i]f a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition, which may be filed [and heard] concurrently with the direct appeal." *Id.*

---

[4] Although we agree that the trial court properly followed the controlling law, we do so because we are constrained to follow our Supreme Court's precedent. *See State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984). But we recognize that the current science, as well as evolving case law, demonstrate that there is no meaningful difference between offenders under the age of eighteen, tried as adults, and those between eighteen and twenty-one who demonstrate that their youthfulness contributed to their offense, justifying an exceptional sentence downward.

Here, Hogan contends that a conflict of interest existed with defense counsel, but Hogan provides no indication of the nature of the conflict or how it prejudiced him at trial. Hogan alludes to a lack of communication between him and defense counsel, but Hogan does not provide any information about this alleged lack of communication. Hogan also contends that defense counsel made a racist comment, but Hogan does not inform this court what the comment was or how it was racist. Hogan alleges that he wrote a letter to the trial court containing those details, but that letter is not part of the record on appeal and cannot be considered. *See* RAP 10.10(c).

Hogan also contends that defense counsel provided ineffective assistance by saying they would likely lose, that there was nothing he could do, and that he did not have a tactic or plan to win the case at trial. These statements are not part of the record and cannot be considered on direct appeal. *See* RAP 10.10(c); *McFarland*, 127 Wn.2d at 335.

Finally, Hogan contends that there was a "clear lack of participation in the adversarial process." SAG at 1. Hogan does not point to any specific occurrence or the nature of this alleged lack of participation in the adversarial process.

Because Hogan has not informed us of the nature and occurrence of the alleged errors, we do not consider Hogan's ineffective assistance of counsel claim.

2.     Offender Score Calculation

Hogan claims that the trial court erred by sentencing him using the wrong offender score. Specifically, Hogan claims that he had "no prior adult cases or charges" that could have counted toward his offender score. SAG at 2. We disagree.

> [W]henever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of

17

the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime.

RCW 9.94A.589(1)(a).[5] "Convictions entered or sentenced on the same date as the conviction for which the offender score is being computed shall be deemed 'other current offenses' within the meaning of RCW 9.94A.589." RCW 9.94A.525(1).

Here, the trial court included the following adult offenses in calculating Hogan's offender score: first degree felony murder, first degree kidnapping, two counts of first degree burglary, first degree robbery, and first degree unlawful possession of a firearm.[6] Each of these adult convictions were entered on the same date as the convictions for which Hogan challenges his offender score, so they count as "other current convictions." *See* RCW 9.94A.525(1). Hogan was sentenced for two or more current offenses, so the trial court was required to determine Hogan's sentence range by counting these "other current convictions" toward his offender score. *See* RCW 9.94A.589(1)(a). Therefore, the trial court did not err by including Hogan's other current adult offenses in calculating his offender score.

---

[5] RCW 9.94A.589 was amended in 2020. However, no substantive changes were made affecting this opinion. Therefore, we cite to the current statute.

[6] Hogan was also convicted of another count of first degree robbery and one count of second degree assault. However, both of these convictions encompassed the "same criminal conduct" as other current convictions. Therefore, these convictions do not count as additional points toward Hogan's offender score. *See* RCW 9.94A.589(1)(a) ("[I]f the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime.")

CONCLUSION

The trial court did not err by admitting Hogan's confession, the evidence was sufficient to prove Hogan committed the second count of first degree burglary, and the trial court did not err by finding it had no discretion to run firearm sentence enhancements concurrently. We decline to address Hogan's ineffective assistance of counsel claim and hold that the trial court sentenced Hogan with the correct offender score. Therefore, we affirm Hogan's convictions and sentence.[7]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

I concur:

Price, J.

---

[7] The concurrence suggests that Hogan could have raised other issues on appeal, including the constitutionality of RCW 9.94.533(3)(e), whether Hogan received an unconstitutional de facto life sentence, and whether the trial court abused its discretion in running counts 1 and 4 consecutively. We do not address these issues because parties must raise issues on appeal in accordance with the rules of appellate procedure by setting forth those issues in their briefing. *State v. Johnson*, 119 Wn.2d 167, 170, 829 P.2d 1082 (1992); *see* RAP 12.1. "Issues not so raised, even constitutional issues, are not properly before this court." *Id.*

CRUSER, A.C.J. (concurring)—I concur in the majority opinion. I write separately to emphasize my dismay at the sheer length of Hogan's sentence in light of his age.[8] Unfortunately, we were not given the opportunity to consider whether RCW 9.94A.533(3)(e)[9] is unconstitutional as applied to a 19 year old, based on the mitigating qualities of youth, because Hogan did not make that argument.

RCW 9.94A.533(3)(e) requires firearm sentence enhancements to run consecutively to all other sentencing provisions. As the majority explains, the law provides that when sentencing a *juvenile*, the trial court may, after considering the mitigating qualities of youth, run firearm enhancements concurrently. *State v. Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017). This sentencing rule has not been extended to defendants who were 18 to 20 years old at the time of their crime. *State v. Mandefero*, 14 Wn. App. 2d 825, 831-32, 473 P.3d 1239 (2020).

In *In re Personal Restraint of Monschke*, 197 Wn.2d 305, 306, 482 P.3d 276 (2021) (plurality opinion), Kurtis Monschke and Dwayne Bartholomew, who were 19 and 20 years old respectively, were each convicted of aggravated first degree murder and given mandatory sentences of life without the possibility of parole pursuant to RCW 10.95.030. On appeal, they argued that RCW 10.95.030 was unconstitutional as applied to them because, at ages 19 and 20, "they were essentially juveniles in all but name at the time of their crimes." *Id.* at 312. Our supreme

---

[8] Hogan was 19 years old at the time of his crimes. He received a sentence of 62 years, with 33 of those years to be served as flat time. Hogan will likely be in his mid to late seventies when he is released. *See* RCW 9.94A.729(3)(a), (3)(c).

[9] RCW 9.94A.533 has been amended several times since the events in this case transpired. LAWS OF 2018, ch. 7, § 8; LAWS OF 2020, ch. 141, § 1; LAWS OF 2020, ch. 330 § 1. Because the amendments have no meaningful impact on this case we cite to the current version.

court agreed, holding that sentencing courts have discretion to take the mitigating qualities of youth into account for defendants both younger and older than 18 because "no meaningful neurological bright line exists between . . . age 17 on the one hand, and ages 19 and 20 on the other hand." *Id.* at 326. Because the aggravated murder statute afforded the trial court no discretion at sentencing regarding the length of the defendants' sentences, the statute was deemed unconstitutional as it applied to defendants who were between 18 and 20 years old at the time of their crimes. *Id.*

In this appeal, Hogan argued, without paying due attention to the distinction in our case law between juveniles and defendants who were between 18 and 20 years old at the time of their crimes, that the trial court actually *did* have the discretion to impose concurrent firearm enhancements and erred by failing to recognize and exercise this discretion. This argument was unfortunately doomed to fail. *Houston-Sconiers* applies only to juveniles. *Mandefero*, 14 Wn. App. 2d at 831-32.

No. 54142-4-II

Because we are constrained by the arguments and assignments of error Hogan chose to raise, I respectfully but reluctantly join the majority's affirmance of the 62-year sentence imposed on Hogan for a crime he committed at the age of 19.[10]

_____
CRUSER, A.C.J.

---

[10] Although Hogan did not receive a mandatory life sentence, he received a de facto life sentence. This is, in my view, beyond dispute. In *State v. Haag*, 198 Wn.2d 309, 313, 495 P.3d 241 (2021), our supreme court held that Haag's 46-year sentence, imposed on him for conduct committed at age 17, was an unconstitutional de facto life sentence. This was so, the supreme court explained, because it deprived Haag of an opportunity to have a "meaningful life outside of prison." *Id.* at 327. Here, Hogan's sentence is far longer than the 46 years deemed unconstitutional in *Haag*, and he will be far older at the time of his release than Haag would have been had his sentence not been reversed.

I also note that Hogan's trial counsel asked the trial court to run counts 1 and 4 concurrently rather than consecutively, as the court had the discretion to do. *See, e.g., State v. Graham*, 181 Wn.2d 878, 887, 337 P.3d 319 (2014) (sentencing court may impose exceptional sentence for multiple serious violent offenses by either departing downward from standard ranges or by running sentences concurrently). This would have lowered Hogan's sentence by 51 months. The trial court instead chose to run those counts consecutively, and Hogan does not argue on appeal that this was an abuse of discretion.